Good morning, Your Honors. Norman Larum, on behalf of the appellants. Warren Fuller, on behalf of the Apollee River Park Place LLC. Thank you. Mr. Larum, you may proceed. Thank you, Judge. And if I may, I'd like to reserve five minutes of the 15 minutes. Very good. Thank you. In the ten minutes that I have, I'd like to address three main issues which are on appeal. The first being whether or not the trial court erred in its May 9, 2011, order in relying upon the exculpatory clause, paragraph 20 of the contract, in relieving the defendant, River Park Place, of liability. Secondly, is the issue relating to contract damages in the case and whether or not the plaintiff did, in fact, establish enough evidence to support an award of contract damages. And then thirdly, whether or not the evidence supported a judgment in favor of the plaintiffs under the Consumer Fraud Act and whether or not the trial court's decision was against the manifest weight of the evidence. So the first issue is with respect to paragraph 20 in this real estate contract between the defendant and my clients. And as the court's aware from the briefs, the defendant marketed and constructed a large complex in Elgin consisting of townhomes and a mid-rise condominium building. They proceeded in a normal fashion with the townhomes. It was during a hot market in 2004, 2005, 2006, all the way up to 2008. And they were selling them like hot cakes. And the prices of those townhomes kept rising. They also marketed at the same time, from the same office, through their brochures and literature, a mid-rise town, I'm sorry, a mid-rise condominium building. And my clients were two of the 58 purchasers of the 60 units in that building. These were buildings to be built. To be built. At the time they sent notice of a price increase, they had yet to be built. That is correct. And they weren't built, they weren't completed for I believe a couple of years thereafter. The mid-rise condominium building has never been completed. Okay. People had signed up, signed their contracts, and thought they were going to buy a unit in the mid-rise building. The contract provided that if the seller was unable or refused to convey or close, that the damages were limited solely to the earnest money, possibly plus interest. I don't recall that exactly. Why is that provision not applicable or valid in this case? The seller default provision was worded in such a way, first of all, it mentioned that if the seller couldn't obtain title from the City of Elgin, that was kind of one of the conditions. But then it goes on and says, if the contract is terminated for any reason, then there are no remedies for the buyer except a return of the purchase money. The reason that paragraph should not be enforced in this case, as the trial court analyzed it in its March 8, 2011 order, is that because the defendant breached the agreement in its February 13, 2006 letter, it terminated all 58 contracts, sorry, it rescinded all 58 contracts by telling my clients and everybody else that So was that a breach or was it what is called under the law an anticipatory breach? That was a breach, and the trial court found that it was a breach. It's a breach because it's an attempt to wrongfully renegotiate a material term of the contract. They told everybody, your price is going to go up because of construction costs. Now, the contract did not provide that the seller could increase the price because of construction costs, but this was a wrongful attempt to renegotiate a material term of the contract. And then it gives consents to everybody and to my clients and says, oh, now you can consent to this price increase, and if you don't, we're going to exercise paragraph 20 and terminate this contract and you get your earnest money back. And that's it. It's established law in Illinois that if a party breaches a contract, then it cannot enforce the same contract it breached. What's your best case for applying that in a condominium building that was never built? Well, our best case is Schwinder. Schwinder is the Schwinder case. So in Schwinder, though, written by Judge Gordon on his bench, was a case involving the kind of building that was actually built. It was. And then the people moved in for two years, and they had a lot of, you know, sleep stuff put in. It was a really nice place, I guess. As Justice Gordon wrote, it's unique. And they lived there for two years. It was common and at great length by Justice Gordon. Well, there are other cases, as I cited in the opening brief. Well, go ahead. I'm looking for them. I've read all the cases. Well, relating to the general situation where a builder who contracts to build a new building defaults and doesn't build it. And the measure of damage is there. That is a breach. That's a default. And again, I'd ask you, which cases are those? They rely on Batchewitz, which involves something that didn't occur, which held that it was too speculative. Batchewitz cites a deity, which was a building that they were going to build a manufacturing plant near a farm, and the farm was to be sold in lots. But since it was never built, when the owner of the farm, who had promised to sell, the seller reneged on that deal, the question is what kind of damages. And there were no damages. They rely on, there's a case, Capelda v. Burlwood, Supreme Court of Massachusetts. Somebody's going to buy land to build a post office. The Fed's backed out. And the question is, well, and the person didn't buy it. What was the purchaser out? Well, nothing, because he couldn't have sold it, frankly. Well, but he lost his benefit of the bargain. And the court, Ross v. Danter Associates, which is cited in the brief, is an illustration of the rule of contract damages when. And what did that involve? It involved a contract by a builder to build a house for a purchaser. And the measure of damage there, as articulated by the court, is the difference between the contract price and the cost of constructing a similar building. There is no requirement that the purchaser actually go out and build a similar building. It's a measure of damage. They lost the benefit of their bargain. The purchaser lost the benefit of its bargain. Otherwise, there's no mutuality of obligation. And Swindler makes a significant point of this, that as a matter of public policy, Illinois. It was a specific performance case. And so they ruled correctly that they had to sell it. They had to convey title because they agreed to convey title. Would you like that specific performance? Should they have built, in this case, this condo tower with 60 units for your two clients, so that the first four floors would be empty, just skeleton, then there would be unit 402, whatever one client bought, then unit 505. They'd have the two units and the rest of it being a skeleton. Well, specific performance isn't available. That's correct. It was available in Swindler. It was available in Swindler. That's correct. Because the building had already been constructed. That's correct. But in Ross, the building had, the new house had never, the house that it was contracted for had never been constructed. Otherwise, a situation like this, the builder can, at least from the contract side, enter into contracts and then breach with impunity with no consequence. But there's a benefit of the bargain. There's a loss of the benefit of the bargain, and there is a measure of damages. And the measure of damages you assert would be based on these letters sent out to, the fact that somebody testified that there were agreements to purchase similar condos within that same building. Well, there's more evidence than that, Judge, in all respect. I spent a great deal of time in the case in chief for the plaintiff developing the evidence from their own documents in November and December of 2005, that they developed relating to how much it would cost the defendant to build this condominium building. And the purpose of that, as well as the purpose of the testimony from Christine Kempfer, who said that they sold 10 or 12 units based on the new prices and the letters they sent to everybody, was to establish the market value of these condos based on their own figures of cost of construction, which is the measure of damages in Ross v. Danter Associates. That's the measure of damages in this type of situation, a building that was never built. So under your theory, when we write this, if we were to write an opinion and accept your theory about this type of recovery, everybody who put in a deposit on buying a condo at, say, the Spire, that large empty hole in the ground by Navy Pier, they would be entitled, would they not, to whatever, from the amount of their purchase price that day to whatever the highest amount was that another imaginary condo that was not built would have been sold, been offered for sale. Would that be right? Well, I'm not going to, it depends on the evidence, but I'm saying. Again, opinions are this. That's how opinions work, counsel. When we write them for you, we write them for the world. I understand, and I understand. Here's your money. So when we hold this, you want us to write, do you want us to write an opinion that would apply to every other unbuilt condominium building in Illinois? Well, what I'm saying is that in this case, the defendants themselves, who are the experts, tried to excuse their breach by saying, we worked up all of our cost estimates two, three months before we sent out the rescission letter, and here's our tables and our lists, and it's going to cost us X dollars, and this is the price, this is the market price, this is the fair market price, and that excuses our performance. And my point is, all this evidence, which is in the exhibits, is support for the market value based on the cost of construction in this case. I can't speak to another case. I can't speculate about another case or another building. I'm saying in this case, for this building, for these units, and in fact, one of my clients' units, Mr. Martinez's unit, was sold to another person under contract for the very price that's in his February 13, 2006. Well, somebody signed a contract for it, right? It was not sold because the title was never delivered, right? Somebody agreed to, right? In my view, it depends, I guess, on the word sold. If you accept their definition of the word sold, but a contract is a binding instrument, and in my view, it was sold. It reflects market value. That's the reason I asked the question. Did you want to go to your uniform? Yes, I do. Thank you. Consumer Fraud Act, I'm sorry. The defendants here, the evidence, I think, was substantial with respect to the Consumer Fraud Act. The defendants never hired an architect to finalize the plans for this building. They never finalized the plans. They never sent any of the work out to bid to subcontractors. They never sought financing. They never had financing for this building. What they did instead is they marketed these condominium units, and then they basically decided to manipulate the market because their townhouses were selling like crazy and the prices kept going, and they decided to rescind 58 contracts, including my clients, and go back into the market, manipulate the market, and in the February 13, 2006, letter itself, there's a bait-and-switch, and the whole theory here is that they employed a bait-and-switch scheme directed at the general public, which was violative of the Consumer Fraud Act when they first marketed these units because they did not take any serious steps to construct the building. They were testing the market. A bait-and-switch usually applies to situations where a customer is brought in, is presented probably a nonexistent deal at a bargain price or a base model, and then steered away from that over to another better model of higher price. So the bait-and-switch doesn't appear to be analogous to your situation. We're still talking about the same condo. The one planned and eventually to be built was always the same, except costs. Then I'm using the term in a different way. I'm talking about telling the general public that we are serious about constructing condominium units. Here's the model. Here's the price. We can construct it for you at this price and that we will go forward. They entered into 58 contracts for the 60 units, and yet they didn't take any substantive action to really develop the building. And in their February 13, 2006 letter, which is where they changed their price, they tell everybody, including my clients, that we're in the final stages. We're in the final stages of the development, and we've received title. And during trial, Kirk Crimson testified, well, that wasn't true, and boy, I should have never made that statement. And the trial court in both orders, in his March 8, 2011 order, said that's a false statement. Now, why was that statement made? It was made to try to induce people to sign that consent so that it relieved the defendant of any contract liability and accept the new price and go forward. At the time this letter was written in February of 2006, they hadn't done anything of a serious nature to move forward with the condominium building, nothing. I mean, this is a fraud on the public. It is consumer fraud, and maybe I'm not using the term bait and switch in a classic sense, but there's certainly deceptive conduct inducing people to come in, to look, to look at the model, to sign the contract, to hire a lawyer, to do everything that a serious buyer would do, thinking that they were going to go forward with this building, when, in fact, they hadn't even let it out to subcontractors. They hadn't finalized their plans. They hadn't obtained financing. They did nothing. They were manipulating the market to see how much they could get, how far they could push these prices up before. And the other thing about it is, you know, this piece of property, as the evidence demonstrated, I mean, the defendant really had a very low basis in the property. I mean, they had a $100,000 investment because they helped the city pay off a condominium action, and they practically got the building, the property for nothing. So they had a very low cost basis in this property. The property is empty now, right? Well, they never built it. They have an option to take this land back and build it for 2014. Let's get in the wayback machine, though. Let's say that the place is built, and your client paid whatever the price is paid. Do you honestly think that those condos now out in this area would be worth what they were paid for, assuming they had gone through? Oh, I think if they built it, yes, because the river boats there, this whole area has been re-gentrified. I mean, the townhouses themselves have changed the area significantly. But I'm saying that if a decision is made between now and June of 2014 to go forward, at least it would have a good value, and I think in the future it would have a good value. I'm just saying I think most people who bought condos at that time have taken a horrible bath. They have up to now, yes. I think you gentlemen are talking about an area where reasonable people can have reasonable differences, which makes it a speculation. We're reserving five minutes for your rebuttal, sir. Thank you. Free reply. Mr. Fuller? Good morning. Good morning. May it please the court, counsel, as well. I think the court has substantially recognized a couple things. Number one is that this building was never built. It was never started. The economy, whatever those factors were. The record is clear, though, that this property was being acquired from the City of Elgin, pursuant to a development agreement, which was specifically referred to in each and every one of the contracts. And while counsel has said that no actions were really taken by the defendant to implement the development, that ignores a substantial amount of evidence, which was introduced during the course of the trial, of the continuing interaction between the defendant as developer and the City of Elgin to obtain zoning to work with the city in resolving environmental conditions, floodway conditions, and other engineering considerations, which, quite frankly, took a substantial amount of time. It is also clear that between October of 2004 and February of 2006, when this letter was sent out, that the developer was continuing to work with its architect to accommodate the life safety and other code requirements of the city, which, with the escalating cost of construction, was the reason that these letters were sent, because the cost had escalated so much. As the court observes, I mean, nobody really knows what the value of these units would be today. But what is clear in the context of this case is that the plaintiffs did not introduce any competent evidence of sustaining a loss. In February and March of 2006, when the defendant developer sent out the letter, they sent out the return earnest money deposit with interest, as is required by the Condominium Property Act, and that tender was refused by the plaintiffs in this case. Now, what evidence did the plaintiffs introduce during the course of the trial to sustain this claim for damages? They introduced, as their sole evidence of damages, a price sheet from 2008, some two years after the defendant endeavored to return their earnest money deposit. Originally, the trial court accepted that 2008 price list, but then reconsidered it in its May 2011 opinion. The reason that it did was, number one, the lack of proximity in time. As the cases recognize, a resale price is certainly competent and relevant to determine the extent of damages, if within close proximity of the date of the breach. At a minimum, we were two years beyond the date of the breach of March of 2006 until this price list from 2008. The other thing which the trial court recognized in its correcting opinion of May of 2011 is that there never was a sale. And recognizing the testimony of the sales agent who testified, the designation of sold on this document was to indicate, one, that there was a contract, two, that somebody may have left a deposit on it, or three, that somebody was just interested and they were holding it off of the market. So indeed, there never was a completed sale, which I believe the reported cases require if you're going to use a comp like that. So what could the plaintiffs have done other than this? There was no opinion evidence that was introduced during the course of the trial of this case of what a 1,500 or 2,000 square foot two-bedroom, two-bath condominium in this particular geographic area was selling for or completed transactions in March of 2006, which is what the court determined the date of the breach to be. There is reference in the trial transcript and in the evidence that both of the plaintiffs were aware that there was another walking distance to this Grand Victoria Casino, which was one of the attractive parts of this particular development. They like to go to the Queen Victoria, which is their right to do so, and this was proximate to it. But there was another condominium development, which, number one, could have been utilized to mitigate damages, which the trial court deemed to be irrelevant because it just limited the damages to the return of the earnest money deposit. But the other thing was is that there were transactions going on from which evidence could have been generated as to what the value of comparable units were during this particular time period. None of that or no evidence of comparable transactions was introduced. No opinion testimony was introduced to substantiate a claim for damages. And that is why the trial court, when it reconsidered its earlier opinion, said, I find that there is only nominal damages of a dollar each and the plaintiffs are limited to the return of their earnest money deposit, which was tendered to them, you know, many years before. So we have a situation here where seven years after the contract was entered into, the building has still never been built. In the original complaint that was filed by the plaintiffs, they did seek specific performance. And, of course, that count of the original complaint was dismissed by the trial court because the trial court did recognize, as it should have, that it was not going to supervise or require the construction of a building when there were so many things that were really not subject to the court's control at that time. We believe that the trial court's reconsideration, which is found in its May 2011 memorandum opinion, was the correct result in this case. Did they breach, though, when they sent out a letter in 2006 saying, we were wrong, it's going to cost a lot more money than we thought? What is it? What does that letter of matter breach? The trial court found that that was a breach, notwithstanding the inclusion in the contract of a provision that said, this whole contract is subject to this development agreement with the city of Elgin, which contains a myriad of conditions, which arguably, some of which the city had never fulfilled. But the trial court didn't reach that part, right? The trial court never held that the city of Elgin did not fulfill those requirements. That's correct. The trial court found that there was a breach of the agreement. It did. And it said that the plaintiff was not entitled to terminate the contract when the purchasers refused to an increase in the price. Now, when we consider — And your client didn't appeal that order, right? Did not. That's correct. The only evidence that really relates to the consumer fraud claim is the evidence of the breach of contract in this case. The only contracting parties who testified were, of course, the plaintiffs. To the extent that there were other contracts, those other contracts, number one, were never introduced into evidence, nor was there testimony from any of the other potential purchasers of the property, who, quite frankly, it's left to one's own imagination as to whether they were happy that the contract was terminated and they got their earnest money back since nothing had occurred in the 16 months or more since they had signed their contracts. It was a — the decision-making of people who contracted to purchase was really not gone into in the evidence in the trial court. The only thing that was clear is that the other potential purchasers all agreed to terminate their contracts and take back their earnest money with interest, which, as I said, is what the Condominium Property Act requires, that the earnest money deposits be kept in a segregated account and that they be interest-bearing. And the tender of those payments were made to the plaintiffs in March of 2006. They refused to accept them. The primary case you rely on, though, is Basher, which was reversed on other grounds, but there seems to be a dearth of cases on this. I'm sorry? There seems to be almost no cases on this issue. I think that it is somewhat of a unique issue in that respect because, as the Court recognized, in Batkiewicz, the condominium building was built. The plaintiff in that case was allowed to move into the union and to make improvements. I'm sorry, you're correct, but Batkiewicz was more on the resale price being two years later than the breach itself. But in the Schwender case, of course, the Court also found that there had been a modification to the original agreement as well. I'm not a practitioner, and that's why I bring it up. I'm astonished that there's no cases on this, considering the huge number of condominium complexes that have gone belly up or just projects not built. Nobody else has thought of this theory of getting money out of it. My client has yet to get a thank you from the plaintiffs that they didn't make the investment in these condominiums. But that, of course, is probably irrelevant too. But what is relevant is what was the amount of the plaintiffs' loss. And, indeed, they didn't submit any evidence to establish a loss. Had this condo eventually been built, say within two years of this breach, and units sold for the prices that were demanded at the time of the breach, would the measure of damages be different in this case under those circumstances? Well, I think that under Batkiewicz, that case, at least the majority opinion in that case, recognized that a two-year period of time was perhaps not proximate enough to the date of the breach itself. But it seems to me that an appraiser, an opinion witness, could take an actual sales price of a unit that had sold in the year 2008 and related that price back to what the value would have been in 2006, two years earlier. I'm sure the court has had other cases before it that have been business situations that went upside down because of what has happened in the world and the general economy. And things certainly went upside down in the residential housing industry during this period of time. Is that it? Yes. Thank you. Thank you, Mr. Fuller. Mr. Laram? Five minutes, sir. Thank you, Judge. I'll begin with the Consumer Fraud Act first, and then move to the contract damage issue. The plaintiffs weren't the only witnesses who testified with respect to the Consumer Fraud Act claim. We spent a lot of time during adverse exam of the defendants themselves, their testimony, their documents, to demonstrate how they had not taken serious steps to build this building and how their marketing representations to the public were deceptions. Especially, again, the February 13, 2006 letter where Mr. Crimsery says, we have now received title and have finalized development plans for the project, which he admitted during trial was not true. And they did it to mislead the public, including my client, to sign the consent in order to get the public really to agree to the higher prices. But then they refused to sign it. So they really weren't doubtful, right? They didn't fall for this lie. Well, but they fell for the first lie. They fell for the first lie. And the first lie was, this is a model. These are the plans. These are the prices. Here's the contract. They went and hired a lawyer. They thought they had a deal. They waited. I mean, they were serious buyers, and so was everybody else. And there was an article that we tried to introduce into evidence indicating the public outrage at this conduct in terms of the deception involved. But this is a consumer practice that was clearly deceptive. And even with nominal damages under the statute, punitive damages are awardable and attorney's fees are awardable because the attorney general simply doesn't have the manpower to prosecute and chase down this kind of stuff. And this kind of stuff happens a lot. And as part of the relief that we've requested is a remand, at least on those issues on damages on the consumer fraud site. Now, with respect to Bokowitz and the contract damage issue, the Bokowitz formula, which I think is reversed by the Illinois Supreme Court, doesn't apply. The evidence here, and it wasn't just the peppered price list in 2008, which was a misconstruction of how we presented this case. It was using their own cost analysis to demonstrate the market value as set on the day of the breach, February 13, 2006. That was the purpose of that evidence. We put it in our proposed findings of fact to the trial court. The peppered list showing 20 units under contract but only 12 were sold was introduced for the sole purpose of evidence under the Consumer Fraud Act. And it's right in the transcript. The defendants objected and the judge asked me why I was introducing it and I said to show the deception under the Consumer Fraud Act, not to prove the market value of these units. We couldn't obtain an appraisal because it wasn't built. Every case is unique. The way we did this was to show by their own evidence, they're the experts, the cost to build. And under Ross, a buyer who's been defaulted by breach of the builder's contract does not have to go out and buy another building. The measure of damage is the contract price versus the price it costs to build a similar building at the time of the breach. And that's what we did in this case. I believe that the case should be reversed and remanded to reinstate the contract damages and to remand for the purpose of determining punitive and attorney's fees under the Consumer Fraud Act. Thank you. Thank you, Mr. Laram. The court is taking this case under advisement. We'll be in recess until 11 a.m.